**M F M COMBINATION SAW MACHINERY CO., Inc., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 16962.**

Court of Civil Appeals of Texas.

Fort Worth.

Dec. 20, 1968.

Rehearing Denied Jan. 17, 1969.

Coleman & Whitten, and Earl L. Coleman, Denton, for appellant.

Crawford C. Martin, Atty. Gen., of Texas, Nola White, First Asst. Atty. Gen., A. J. Carubbi, Jr., Executive Asst. Atty. Gen., Watson C. Arnold, Asst. Atty. Gen., Austin, Robert Weldon Knight, Denton, and Leslie King and Charles R. Lind, Asst. Attys. Gen., Austin, for appellee.

## OPINION

LANGDON, Justice.

This is a condemnation case. It was initiated by the State of Texas to condemn 4.222 acres (183,928 square feet) out of a 6.020 acre tract of land on the outskirts of Denton, Texas. The land is needed for construction of the intersection complex of Interstate Highway 35W out of Fort Worth, Texas, and Interstate Highway 35E out of Dallas, Texas, which merges at Denton and proceeds north into Oklahoma as Interstate Highway 35. The interchange is now being constructed. The date of taking was August 26, 1966.

The Plaintiff's Petition for Condemnation was filed. Notice of hearing was given defendant. The Special Commissioners, after hearing the evidence, returned an award of $275,892.00 on August 1, 1966. Both the State and the defendant filed objections to said award. The plaintiff filed its First Amended Original Statement or Petition for Condemnation alleging enhancement of the remainder and prayed for general relief. The case began on November 14, 1967, before a jury. It was completed when the jury returned its verdict on November 16, 1967.

The appellant presented as witnesses two of its stockholders, the President of the Denton Board of Realtors, a local real estate agent, and a local Humble distributor, each of whom testified to a figure of $2.50 a square foot for the portion of land taken. This amounted to $459,820.00 or approximately $108,910.00 per acre. There was disagreement among these witnesses as to damages to the remainder. Some testified yes and others no.

The State presented, as witness, a land appraiser (who was also a licensed realtor) from Dallas, who testified to a value of $153,560.00 for the land being taken. This amounts to approximately .835 cents a square foot. He considered the value of the remainder to be enhanced by $4,910.00 and thus no damage.

Appellee next called a local real estate developer in Denton who was part owner of comparable property. He testified to $1.00 a square foot or $183,928.00 for the part taken. He testified that the value of the remainder was $1.00 a square foot before and after.

Except for the finding that the .644 acre remainder had enhanced to $1.25 a square foot rather than to place a value of $1.00 per square foot before and after the jury apparently followed the testimony of the latter witness who in our opinion was very objective and straightforward in his response to the questions propounded to him on both direct and cross-examination. This witness did not seek to bolster nor emphasize his testimony nor did he demonstrate any impatience or hostility at questions propounded to him by either side. The conduct of all witnesses who testified in the case cannot be characterized or described in the same manner.

Three issues were submitted to the jury. Judgment, based upon the verdict of the jury, was rendered in favor of the appellant against the State of Texas for the sum of

$183,928.00; said sum being the jury's finding of value for the 4.222 acres of land being taken for highway purposes. The judgment further decreed that appellee recover from the appellant the sum of $91,964.00 with interest at 6% from date of judgment until paid. This sum represents the difference between the $275,892.00, awarded by the Special Commissioners (which amount was withdrawn from the registry of the Court by the appellants), and the $183,928.00 value found by the jury. The jury further answered that the remainders before the taking were worth $1.00 a square foot and that the small remainder after the taking, being .154 acre, continued at $1.00 a square foot, but that the larger .644 acre remainder had enhanced to $1.25 a square foot, thus there was found no remainder damage.

The appellant vigorously contends that the court committed reversible error in overruling its Amended Motion for New Trial. The first, second, third, fourth and sixth points of error pertain to statements made by opposing counsel during the trial which were complained of in the Amended Motion for New Trial. The fifth point deals with jury argument which was complained of for the first time in appellant's Motion for New Trial. By the seventh point it is urged that the cumulative effect of the alleged errors, one through six, was such as to cause rendition of an improper verdict and could not have been cured by instructions. Comments made by the court as to certain evidence is the subject of point eight, while the ninth and final point complains of the court's action in rendering judgment for $91,964.00 in favor of the State (appellee) against the landowner in the absence of a prayer for such relief. The basis for this point is not contained in the Original or Amended Motion for New Trial. It is raised for the first time on appeal. No objections or exceptions to the pleadings appear in the record.

We affirm.

The statement made in the presence of the jury which is the basis for point one was: "We've got to value this like it was a remainder, like this has already been taken, has already been bought. The State has bought it." It is contended that the statement was a misstatement of both the law and the facts and as such materially affected the jury's consideration of the issues since in effect the statement assured the jury that the State had already bought the property once. It should be noted at this point that the record contains numerous references to the property "taken" by the State and the date of such taking as well as references to the remainders.

The statement complained of was made during cross-examination of appellant's witness Crouch, who testified on direct that the remainder (the two parcels) "after the taking" would sell for the same value, i. e., $2.50 per square foot, as they would before the taking. On cross the witness was asked if the value of the small remainder had been increased or decreased by the taking. The witness answered it had been decreased. He was then asked by how much.

"A  I based my overall appraisal—this is left here and I think it needs to be put in with it, and if it's left alone it would be worth what someone would pay for it, and your guess is as good as mine.

"Q  So you can't tell this jury *has* much it has been decreased, then, is that your testimony, sir?

"A  I can tell this jury with all sincerity of what I could sell the land for if the State Highway had not have taken this, and that is two and a half a square foot. If that little bit of land is in with it, and it is in with it, and it was owned by these gentlemen, then—

"Q  We can't do that, sir. We've got to value this like it was a remainder, like this has already been taken, has already been bought. The State has bought it. *We've got this small tract here and this small tract here. How much has it been decreased, this small remainder?*" (The portion above

italicized by us completes, and we think explains, the statement complained of.)

It appears obvious that the State was trying to determine from this witness the value of the small remainder after the taking. No objection to the question or statement was made by the appellant nor was any instruction requested. Complaint was made for the first time in the Motion for New Trial.

The "side-bar" remark made the basis of the second point of error also arose during cross-examination of the witness Crouch who was asked if in his opinion Mr. Rayzor knows market value. The question was objected to as being immaterial since Rayzor was not a witness. Following the objection counsel for the State in the presence of the jury stated, "We will withdraw the question if they don't want to answer it." Appellant contends that such statement was calculated to and probably did cause the jury to believe that appellant was trying to hide something.

Most, if not all, of the witnesses referred to land which had been bought or sold by Mr. Rayzor and the amounts paid or received therefor.

The circumstances under which the "side-bar" remark arose are as follows:

"Q Let's go across the way. Do you know about the Lynch to Rayzor sale at the frontage road and Bonnie Brae, right across the highway, a three acre tract, approximately?

"A Who was it sold to?

"Q Mr. Rayzor.

"A I am not familiar with Mr. Rayzor's —he buys and sells so much and exchanges it that the realtors don't try to keep up with a great lot of Mr. Rayzor's activities.

"Q Does Mr. Rayzor know market value, in your opinion?

"A Sir?

"Q In your opinion do you think Mr. Rayzor knows market value?

"Mr. Coleman: Your Honor, we are getting just a little bit, I think—I hate to interrupt but I can't see the materiality of whether this man thinks Mr. Rayzor knows market value or not. If they want to call Mr. Rayzor that's all right. He can tell us.

"The Court: *I don't either.*

"Mr. Coleman: We object to it.

"Mr. Lind: We will withdraw the question if they don't want to answer it.

"Mr. Coleman: It's not a question of not wanting to answer it, Your Honor. *It's not a proper question.*

"The Court: *All right."* (Emphasis ours.)

Judging from the trial court's remarks he did not consider the "side-bar" remark proper. He, therefore, sustained appellant's objection. The appellant did not request an instruction nor did he make a motion to strike.

Point three involves another statement (portions of a question) made in the presence of the jury by appellant's counsel. This statement complained of as being highly prejudicial was as follows: "But now this Jury is going to buy 4.222 acres of land just like it lays out there." Appellant contends that by such statement the jury was placed in the position of a purchaser of the property and thus caused to view the matter from the standpoint of the buyer.

The statement complained of arose on cross-examination of appellant's witness Cole, as follows:

"Q Now what is the highest and best use of the subject property?

"A The highest and best use, I would think, would be local business.

"Q A shopping center?

"A Well, I think you would call it more or less a strip center.

"Q A strip center?

"A Yes, sir.

"Q What is the difference between a strip center and a shopping center?

"A Well, your strip centers generally are a little bit smaller than your real shopping centers are. Your shopping centers would require probably more land than a strip center would require.

"Q But now this jury is going to buy four point two two two (4.222) acres of land just like it lays out there, *not subdivided—it has never been subdivided like a residential subdivision, is that right?* (Emphasis ours.)

"A Uh huh.

"Q So we've got to value this part here as being taken by the State Highway Department as of August 26th, and you might call it raw acreage, Hoyt, and is it still your opinion we ought to pay two dollars and fifty cents a square foot for all of it?

"A Yes, sir." (The language above italicized by us to complete the statement complained of together with the last question in context explains the nature of the information sought by the State from the witness.)

No objection was made to such statement or question at the time of trial. Complaint was first raised in the Motion for New Trial. No instruction was requested. Counsel for appellant made reference to the same statement in his argument to the jury as follows:

"The testimony shows, and by these good men—I think if you will look at all the evidence it's justified that that was well adapted and well suited to the plant and the business that they operated. * * So it was well adapted to the purposes for which it was being used. They had faith in that earth out there, and that's what you are buying. You are not buying. I hope you are selling. Counsel yesterday referred to the fact that this jury was going to buy the land. That is not what you are going to do. That wouldn't be fair. You are not going to do that. Neither are you just going to sell it, because you know, ladies and gentlemen, when you buy property you try to buy it as cheaply as you can. * * *"

It would appear from the above argument that appellant did not deem the statement complained of to be prejudicial at the time of the trial else it would not have been emphasized in the argument.

By its point four the appellant contends that highly prejudicial and improper statements made by one of the attorneys for the State in the presence and hearing of the jury to the effect that the defendant's attorney was trying to get improper evidence before the jury placed such attorney in a bad light before the jury and caused the court and the jury to look upon said attorney without that degree of fairness to which the defendant was entitled and such conduct was highly prejudicial and caused the rendition of an improper verdict.

The complaint made by appellant's fourth point of error arose from testimony given by Mr. Moss, one of appellant's stockholders, regarding the value of improvements. He testified on direct examination that his value of $2.50 per square foot included all buildings and everything. He then testified that the "small" remainder would be reduced in value approximately fifty percent. That he was not complaining regarding the larger remainder being damaged and was not asking the jury to add "one dime" for any improvements. In response to a question by his counsel, he testified that the State took the improvements. At this point counsel for the State objected basing his objection upon the "leading question."

Counsel for appellant confirmed that the question was a leading question and stated that he did not think that counsel for the State really meant that he, the counsel for appellant, was trying to get

the witness to change his testimony. Counsel for appellant did state that it was necessary to clarify the position taken, and that "our position" is that the improvements did not add anything to the value of the land or had no worth.

At the time of trial it appears that counsel placed no great importance upon the statements now complained of. He apparently recognized at that time judging from his remarks that counsel for appellee meant no such inference as is now contended. Appellant made no request to strike the remarks. The court was not requested to instruct the jury to disregard the remarks.

Appellant contends in its fifth point of error that a portion of the argument made by one of the attorneys for the State was extremely unfair, derogatory, and vicious concerning the appellant and appellant's attorney and that the remarks, in effect, compared appellant and its attorney to swindlers and cheats.

It does not appear from the record that such remarks were directed toward the attorney for appellant or to the appellant.

■ We are of the opinion that when the questioned argument is read in context and considered in the light of the entire record it refers only to the failure of the appellant to bring in sales which would support testimony of its witnesses regarding market value.

The full context of the statement complained of is as follows:

"I have a friend of mine, I went through high school in Austin, Sammy Allred—you might have heard him on the Arthur Godfrey show. He did country music. He had a record out talking about he was walking down the streets of New York City and this guy came up to him and said, 'Do you want to buy the Brooklyn Bridge', and Sammy, in his song, turns to him and says, 'You wouldn't be putting the shuck on me, would you'—another guy

comes to him and tries to sell him the Empire State Building, and he answered, 'You wouldn't be trying to put the shuck on me, would you'. They are trying to put the shuck on you. If they had sales out there in that area they would have brought them in. Their own witness across the street introduced a sale prior to this one here, prior to our jury trial, two point nine nine (2.99) acres himself at approximately sixteen thousand dollars an acre. He forgot. I helped him remember and he read it out to you. I am sure Hoyt forgot that he had used that sale in the area as close to it as you could get besides the sale Mr. Miller and Mr. Moss made of the apartment house."

A review of the testimony of the witnesses presented by appellant reflects that their opinions of market value were based solely on sales of service station sites which admittedly bring higher prices. It has been previously noted that each of such witnesses, without any variance, testified to a value of $2.50 per square foot. No witness for appellant testified that the highest and best use of the subject tract was for a service station. Miller and Moss testified that their service station site, out of the parent tract, sold prior to condemnation because the "new taking" would create a corner location. The exhibits and testimony in this record clearly established that prior to the taking, the tract involved in this condemnation did not have a corner on Bonnie Brae and the highway. The combined testimony of all witnesses was that the highest and best use of the subject property prior to condemnation was for manufacturing, strip center, shopping center, apartments and local business.

In his argument to the jury appellant's attorney stated, "A service station site doesn't necessarily make market value, but a service station site means that that's an ideal piece of property for traffic."

At another point in his argument he said, "Counsel has said that they want to

be fair. He wants to be entirely fair, *and I am sure that they do. I don't question that.* It just depends upon which side of the fence you are on." (Emphasis ours.)

Appellant's sixth point of error relates to a request by counsel for the State for production of the corporate income tax records of appellant. The request for the production of such records arose as follows:

Moss testified that MFM bought the property in 1949, and was first engaged in manufacturing a self-propelled saw unit and later added other items. He testified that the subject property was well adapted to the manufacturing business.

Attorney for appellant then stated to the court that this line of questioning was for the limited purpose of showing adaptability of the property. Moss then testified that appellant was not in the manufacturing business in August, 1966, because when they learned there was to be a "taking" they started disposing of their machinery. That by August 26, 1966, the date of taking, the property owned by MFM was zoned for local business. That the company had grown in products and in volume over the years and they hoped to expand to include the entire tract. He then stated that the value of $2.50 per square foot included both land and improvements but that he was not asking "one dime" for the improvements, and that they "didn't take the improvements too seriously in putting the price on it."

On redirect Mr. Moss testified that there was a "going business" on the property prior to 1966. Mr. Coleman, counsel for appellant, then asked Mr. Moss if he had included any damages "sustained by reason of being put out of business." Mr. Moss answered as follows:

"A  Well, yes, we have had—"

Counsel for appellant interrupted his own witness with the following remark:

"Q  (interposing)  I am not asking you about what you have had to do. I am asking you whether that figure includes any of that?"

At this point counsel for the State moved for a mistrial because of the injection of the issue of loss of business. Counsel for appellant then asserted that he only wanted to make sure that Mr. Moss had excluded any damages due to the loss of business, and it was at this point and under these circumstances that the counsel for the State asked for the tax records so that a determination could be made as to any business loss. Although counsel for appellant insisted to the trial court that he was not trying to establish a business loss, his next line of questioning was:

"Q  Is it still in business as far as owning—

"A  (interposing)  We have our business. It's two little pieces of ground that's left. That's all of our business.

"Q  And actually, I believe your testimony was that the reason you weren't actually operating in '66 was because you had already heard in '64 or '65 that this was going to be taken?

"A  They had already notified us."

At this point, counsel for the State again interposed objections based upon loss of business, whether direct or indirect reference was made, and again moved for a mistrial. Counsel for appellant did not join in either motion for mistrial.

The question of "business loss" was injected in the case for the first time during the particular portion of the trial above described. This would explain why the tax records were at that time requested by the State for the first time rather than prior to trial when no element of "business loss" was anticipated. Once appellant disclaimed any element of "business loss" the request for tax records was not pursued.

By its seventh point the appellant insists that the accumulative effect of the alleged

errors, one through six, was such as to cause rendition of an improper verdict and could not have been cured by instructions because the minds of the jurors had already been poisoned.

■ We are of the opinion that the alleged errors, if any, complained of in appellant's points one through six, do not singly or in combinations or all combined and considered as one constitute a denial of the rights of the appellant. No single error complained of or combination of such errors, if any, were reasonably calculated to cause and probably did cause a rendition of an improper verdict in our opinion.

The comments of the court on evidence is the basis for point number eight. An objection was made to testimony involving an option and the conditional exercise thereof by letter. At this time the court in the presence and hearing of the jury stated:

"I think, Mr. King, Mr. Moss and Mr. Miller both testified it was not completed." (Reference to the option contract to purchase a service station site.) At this point counsel for State said, "I am going to ask the Court again to instruct the jury not to consider it for any purpose." The court responded in the presence of the jury as follows: "I am willing to do that. I don't know what value it has." The questioned evidence was later admitted by the court.

■ The court further stated in the presence and hearing of the jury: "I think all the testimony has been that the contract has been incomplete, not completely executed, and was withdrawn and they selected a new tract." In our opinion the statements made by the court were very accurate and did not prejudice the appellant. If such comments constituted error we are of the opinion that such error, if any, was cured by the subsequent admission of such instruments along with the testimony relating thereto over the objection of the State.

Appellant made no complaint of the comments made by the court at any time during the trial but complained of them for the first time in its Motion for New Trial. During the trial appellant's chief efforts were directed toward getting the option agreement and letter relating thereto introduced into evidence. It succeeded in this endeavor.

State v. Wilemon, 393 S.W.2d 816 (Tex. Sup., 1965); see also Maddox v. State, 373 S.W.2d 322 (Amarillo Tex.Civ.App., 1963, writ ref., n.r.e.). See also McCormick and Ray, Texas Law of Evidence, Second Edition, Sec. 29, pages 29 and 30.

■ The ninth and final point complains of the court's action in rendering judgment for $91,964.00 in favor of the State against appellant landowner in the absence of a prayer for such relief. The complaint made the basis of this point is not contained in appellant's Original or Amended Motion for New Trial. As previously stated it is raised for the first time on appeal. No objections or exceptions to the pleadings, issues, or instructions based thereon appear in the record. Thus the point was waived and not properly before this court. Rule 374, Texas Rules of Civil Procedure; Ashner v. Robinson, 344 S.W.2d 909 (Dallas, Tex.Civ. App., 1961, no writ hist.); Ligon v. Green, 206 S.W.2d 629 (Fort Worth, Tex.Civ. App., 1947, no writ hist.).

■ Further we are of the opinion and hold that the point is without merit as a matter of law. Varnado v. City of Groves, 329 S.W.2d 100, 103 (Fort Worth, Tex. Civ.App., 1959, writ ref., n.r.e.). See also Sec. 3, Art. 3268, Vernon's Ann.Tex.Civ.St.

■ The verdict of the jury was well within the evidence presented by the parties to this suit. It was not based upon the highest values placed upon the land taken or upon the lowest of such values. We are unable to find any error of such a prejudicial nature as would have persuaded a juror of ordinary intelligence to agree to a verdict contrary to one he would have agreed to in the absence of the errors

complained of. The errors, if any, complained of, without exception, could have been cured by proper objections, requests to strike and request for instructions to disregard or not to consider the various statements complained of.

All of the points of error urged upon this court by the appellants are overruled. The judgment of the trial court is in all things affirmed.